AO 106 (Rev. 04/10) Application for a Search Warrant

SEALED

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED
AUG 25 2017
JULIA C. DUDLEY, CLERK
BY: /s/ J. Jones
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH USERNAMES: J.FIELDS; JAY.FIELDS THAT ARE STORED AT PREMISES CONTROLLED BY SKYPE

) ) ) ) ) )

Case No. 3:17-mj-00044

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the __Western__ District of __Virginia__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sec. 249 | Hate Crime Violations |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christopher Hartley, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/25/17

City and state: Charlottesville, VA

_____
*Judge's signature*

Joel C. Hoppe, U.S. Magistrate Judge
*Printed name and title*

**SEALED**

CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

AUG 25 2017

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR THE
FOR THE
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF A SEARCH OF:<br><br>INFORMATION ASSOCIATED WITH<br>USERNAMES: J.FIELDS; JAY.FIELDS<br>THAT ARE STORED AT PREMISES<br>CONTROLLED BY SKYPE AND/OR<br>MICROSOFT, CORP. | Case No. 3:17-mj-00044<br><br>**UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## FOR A WARRANT TO SEARCH AND SEIZE

I, Christopher Hartley, being duly sworn, depose and state as follows:

### INTRODUCTION

1. I am a Special Agent of the United States Department of Justice, Federal Bureau of Investigation ("FBI") and have been so employed since February 2016. I am assigned to the Washington Field Office, Northern Virginia Resident Agency, located in Manassas, Virginia. My principal duties include the investigation of, among other matters, civil rights violations of the United States.

2. I am a federal law enforcement officer under applicable provisions of the United States Code under Rule 41(a) of the Federal Rules of Criminal Procedure. I have received training in and have experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrants, and in executing court-ordered search warrants.

3. I make this affidavit in support of an application by the United States of America for a warrant to search and seize evidence associated with Skype Usernames **jay.fields** and **j.fields**, as further described in Attachment A.

1

4.      Based on the information below, I submit there is probable cause to believe the aforementioned Skype account will contain evidence, as more fully identified in Attachment B, of violations of federal law, including, but not limited to, Title 18, United States Code, Section 249 (Hate Crime).

5.      Through training and experience, the Affiant has knowledge that domestic terrorists and persons affiliated with white supremacists group and/or conspirators will utilize cell phones, and other electronic devices, electronic mail ("e-mail"), social media, and online mobile chat platforms to conduct their illegal activity and maintain contact with other confederates, conspirators and criminal associates involved with the planning, targeting, and execution of their political or social goals to include, but not limited to, espousing violence.

6.      The Affiant bases this affidavit upon personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officers assigned to this investigation, and upon my personal review of records, documents, and items lawfully obtained by third parties. This affidavit is not intended to include each and every fact known to me or the other investigating agencies, nor does it reflect all the evidence developed during the course of the investigation. Instead, the Affiant has set forth sufficient information to establish probable cause for the issuance of the requested search warrant. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part.

## RELEVANT STATUTE

7. Title 18, United States Code, Section 249, provides that "Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person" shall be guilty of a federal offense.

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND

9. On August 12, 2017, a "Unite the Right" rally was held at Emancipation Park in Charlottesville, Virginia. The proclaimed purpose of the planned rally was to protest the removal of the Robert E. Lee and Thomas "Stonewall" Jackson statues in Charlottesville, Virginia. Several groups espousing right-wing nationalist and/or white supremacist views attended the rally in support.

10. In addition, several thousand counter-protestors attended the rally to oppose the rally and its supporters. Throughout the day, several instances of violence occurred between protestors and counter-protestors. At approximately noon, the rally was declared an unlawful assembly by the Charlottesville Police Department, and both protestors and counter-protestors dispersed to separate locations.

11. A group observed by law enforcement at the aforementioned rally was Vanguard America, whose beliefs are stated as:

> *"The chains of debt slavery wrap themselves tight around White Americans, such conditions must be reversed. A new generation of corporate leaders, who hold the interests of White America first and foremost, will naturally rise to the top of this new economy."*

Below is a picture of the Vanguard America emblem taken from the website https://bloodandsoil.org/:



The right-wing nationalist slogan "blood and soil" is derived from a German phrase, used by Adolph Hitler's Nazis, that purportedly promotes the notion that people with "white blood" are uniquely connected to "American soil."

## PROBABLE CAUSE

12. The FBI is conducting an investigation into possible violations of federal criminal law committed by JAMES ALEX FIELDS ("FIELDS"), an individual allegedly associated with Vanguard America and other white supremacist groups. The investigation was initiated following receipt of information FIELDS drove this vehicle, a grey Dodge Charger bearing Ohio license plate GVF1111, into a crowd of people during the "Unite the Right Rally" in Charlottesville, Virginia on August 12, 2017. The incident killed one Caucasian female and injured approximately twenty (28) other individuals of African-American and Caucasian descent.

13. Based on Affiant's review of the video footage of the incident, FIELDS' vehicle travelled at a high rate of speed when it struck rally counter-protestors, including African-Americans. After striking multiple victims with his vehicle, FIELDS drove his vehicle backwards, in reverse, at high-rate of speed to flee the scene.

14. After his arrest by the Charlottesville Police Department, FIELDS was observed dressed in a white polo shirt, khaki pants, and black shoes. FIELDS' hair was trimmed with a "high and tight" or "side-fade" style consistent with the hair style of other individuals associated with the white supremacist group Vanguard America at the rally. Below is a picture of FIELDS that law enforcement officials obtained from social media at the Charlottesville "Unite the Right" rally. Fields is second person from the left with the large black shield in front of him.



15. The Affiant learned from law enforcement officials and review of video footage, one individual was in the vehicle at the time of the aforementioned incident. After the

5

Charlottesville Police arrested FIELDS, his vehicle was towed and stored in a secured law enforcement facility.

16. The Charlottesville Police Department obtained a search warrant for the Dodge Charger and seized one Samsung cellular phone lying on the front passenger seat. The cellular phone was plugged into the outlet and was located as seen below, where it was accessible to the driver of the vehicle. This was the only phone that was recovered in FIELDS's vehicle.



17. On August 12, 2017, the FBI interviewed SAMANTHA BLOOM ("BLOOM"), a woman identified as FIELDS' mother. BLOOM confirmed details about FIELDS and his trip to Charlottesville, Virginia for the "Unite the Right" rally. According to BLOOM, this information was received by BLOOM from text message sent from FIELDS.

6

18. During the interview, BLOOM confirmed FIELDS' telephone number is 859-414-9660.

19. The FBI confirmed e-mail address, amerikan-steel@outlook.com was listed as a point of contact by FIELDS on his Ohio Driver's License application. The FBI conducted open source research that indicated e-mail address amerikan-steel@outlook.com identified associated Skype accounts **j.fields** and **jay.fields**.

20. In my training and experience, I have learned that Skype is a company that provides online text messaging and video chat services to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for Skype subscribers may be located on the computers of Skype. Further, I am aware that computers located at Skype contain information and other stored electronic communications belonging to unrelated third parties.

21. Online text messaging and video chat service providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of Skype for weeks or months.

22. Among the services commonly offered by online text messaging and video chat service providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by

subscribers, may be stored by Skype for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

23. Online text messaging and video chat services providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

24. Online text messaging and video chat service providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its

embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

25. Many online text messaging and video chat service providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

26. Online text messaging and video chat service providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

27. In some cases, online text messaging and video chat service subscribers may communicate directly with a provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Online text messaging and video chat service providers typically retain records about such communications, including records of contacts

between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

28. As explained below, information stored at the online text messaging and video chat service provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cellular device owner.

29. Additionally, information stored by the online text messaging and video chat service provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information

relating to the cellular device in the possession of the online text messaging and video chat service provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

30. Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Skype who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Christopher J. Hartley
Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me this 25th of August, 2017.

United States Magistrate Judge

11